Haughton v Feinberg (2026 NY Slip Op 50379(U))

[*1]

Haughton v Feinberg

2026 NY Slip Op 50379(U)

Decided on March 24, 2026

Supreme Court, Kings County

Mallafre Melendez, J.

Published by New York State Law Reporting Bureau pursuant to Judiciary Law § 431.

This opinion is uncorrected and will not be published in the printed Official Reports.

Decided on March 24, 2026
Supreme Court, Kings County

Merlet Haughton, Plaintiff,

againstMichelle Lauren Feinberg, M.D., ERIC SAINT CLAIR, M.D., ALI D. SADR, M.D., SKEETER BARLEY, P.A., ARIEN JAVON SMITH, M.D., DMITRY NIKOLAEVICH KUZMIN, D.O., NEW YORK CITY HEALTH AND HOSPITALS CORPORATION and KINGS COUNTY HOSPITAL CENTER, Defendants.

Index No. 503095/2023

PlainitffChristopher Michael Nyberg (c.nyberg@fuchsberg.com)The Jacob D. Fuchsberg Law Firm, LLP3 Park Avenue Suite 3700New York, NY 10016212-869-3500 
DefendantsJoe Benjamin Swart, Esq. (joe.swart@wilsonelser.com)Wilson Elser Moskowitz Edelman & Dicker LLP150 East 42nd StreetNew York, NY 10017212-915-5483

Consuelo Mallafre Melendez, J.

Recitation, as required by CPLR § 2219 [a], of the papers considered in the review:
NYSCEF #s: 44—65, 66—81, 82
Defendants Michelle Lauren Feinberg, M.D. ("Dr. Feinberg"), Eric Saint Clair, M.D. ("Dr. Saint Clair"), Ali D. Sadr, M.D. ("Dr. Sadr"), Skeeter Barley, P.A. ("P.A. Barley"), Arien Javon Smith, M.D. ("Dr. Smith"), and New York City Health and Hospitals Corporation ("NYCHHC"), also sued herein as Kings County Hospital Center, move for an Order, pursuant to CPLR 3212, granting summary judgment in their favor, and dismissing all Plaintiff's claims against them (Seq. No. 1).
Plaintiff opposes the motion as to Defendants Dr. Feinberg, Dr. Saint Clair, Dr. Sadr, P.A. Barley, [*2]and NYCHHC/Kings County Hospital Center.
Plaintiff does not oppose the part of the motion seeking summary judgment in favor of Dr. Smith. Accordingly, that part of the motion is granted without opposition, and all claims against Dr. Smith are dismissed. Any vicarious liability claims against NYCHHC on behalf of Dr. Smith are also dismissed.[FN1]

Plaintiff also does not oppose the part of the motion seeking summary judgment on any claims of medical malpractice prior to February 6, 2022, the cause of action for lack of informed consent, and the cause of action for negligent hiring. The motion is therefore granted to the extent of dismissing those claims without opposition.
Plaintiff commenced this action on January 30, 2023, asserting claims of medical malpractice against Defendants in connection to the diagnosis and treatment of continued and worsened spinal cord compression following a laminectomy.
Plaintiff was 47 years old at the time of the events at issue. She had been diagnosed with cervical syrinx (cyst in the spinal cord) in March 2017, and she began seeing Dr. Feinberg at Kings County Hospital Center beginning on January 7, 2021. She had progressive weakness in her upper extremities and less advanced but increasing weakness in her lower extremities, and by January 2022, it was noted that "she previously was able to ambulate with a walker but can no longer do that." Dr. Feinberg assessed her with worsening symptoms of stenosis and spinal cord compression at C5-C7 and scheduled a laminectomy procedure. Dr. Feinberg testified that she had "severe quadriparesis, but she was not quadriplegic" at that time.
Plaintiff underwent spinal surgery at Kings County Hospital Center on February 1, 2022, which included a C5-C6 and partial C7 laminectomy. The procedure was performed by Dr. Feinberg with assistance from Dr. Saint Clair, who Dr. Feinberg testified was a "senior" attending neurosurgeon at the hospital. Plaintiff was transferred to the Post-Anesthesia Care Unit in stable condition.
From February 2 through February 5, Plaintiff remained stable and was documented as being neurologically intact compared to her baseline, with 4/5 and 5/5 strength in her lower extremities.
On the evening of February 6, 2022, approximately five days after surgery, Plaintiff complained of new onset weakness, neuropathic pain, difficulty moving her legs, and decreased movement in her right upper extremity, as documented in text messages from a physician's assistant, nonparty P.A. Augustin. Dr. Feinberg testified that she was out of state and "intermittently" updated about Plaintiff's status. Dr. Saint Clair was the "on call" attending neurosurgeon during the February 6-7 overnight shift until approximately 7:00 a.m. or 8:00 a.m. on February 7, at which time Dr. Sadr took over as the attending neurosurgeon, according to the Defendants' testimony. However, Dr. Saint Clair testified that Plaintiff was still at her baseline the last time she was examined on February 6.
Although Dr. Feinberg was not the on-call attending physician on February 6, P.A. Augustin sent a text message to Dr. Feinberg at 9:57 p.m. regarding Plaintiff's reduced lower extremity movement and asked whether to order a lumbar MRI. Dr. Feinberg responded to the P.A. "you can order it [lumbar MRI]" and "try some Valium while waiting." The following morning at 8:59 a.m., Dr. Feinberg texted the P.A. to "add c spine" MRI.[FN2]

A cervical spine MRI was ordered on February 7 at 9:05 a.m., and the results were reported to Dr. [*3]Sadr at 3:30 p.m. The findings included "extensive posterior epidural hemorrhage" and "posterior epidural hemorrhage and degenerative changes result in severe spinal canal stenosis." A progress note from defendant P.A. Barley at 3:56 p.m. documented the plan to "possibly return to the OR for evacuation of epidural hematoma." Dr. Sadr testified that he consulted with P.A. Barley but determined emergent surgery was not indicated by the MRI. He testified that "my assessment was that the spinal cord actually looked more normal on the scan than on the pre-op scan," and the appearance of fluid or compression was "misleading."
Dr. Feinberg became directly involved in Plaintiff's care again on February 8, at which time she directed a P.A. to obtain consent for a "C3-C7 laminectomy, possible extension, evacuation of hematoma." Plaintiff was taken to the operating room at 3:26 p.m. on February 8, and the second laminectomy procedure was performed by Dr. Feinberg and Dr. Saint Clair. Dr. Feinberg noted that she saw seroma (clear fluid) but not a hematoma, and she made a "small durotomy at C5" but did not see a bleed. Following the second procedure, Plaintiff's neurological deficits did not improve. She was discharged to Four Seasons Subacute Rehabilitation Center on February 14, 2022. Plaintiff alleges that since her discharge, she has remained bedbound and quadriplegic with limited upper extremity strength, no lower extremity strength, and "functional paralysis" of all four limbs.
Plaintiff alleges that the defendants failed to timely diagnose and treat Plaintiff for signs and symptoms of fluid in the epidural space. She alleges that the attending surgeons failed to timely order, perform, and obtain the results of a cervical MRI on a "stat" basis on February 6, 2022. Plaintiff further alleges that Dr. Sadr improperly interpreted the February 7, 2022 MRI report, and the physicians failed to perform the second surgery on an emergent basis or take the patient for additional surgery after February 8. Plaintiff also alleges the staff and neurosurgical P.A.s, including defendant P.A. Barley, did not adequately communicate her symptoms to the attending surgeons.
In evaluating a summary judgment motion in a medical malpractice action, the court considers the "essential elements" of medical malpractice: "(1) a deviation or departure from accepted medical practice, and (2) evidence that such departure was a proximate cause of injury" (Miller-Albert v EmblemHealth, 231 AD3d 1147, 1148 [2d Dept 2024] [internal quotation marks and citations omitted].) "Thus, a defendant moving for summary judgment must make a prima facie showing either that there was no departure from accepted medical practice, or that any departure was not a proximate cause of the patient's injuries. To meet that burden, a defendant must submit in admissible form factual proof, generally consisting of affidavits, deposition testimony and medical records, to rebut the claim of malpractice." (I.d.) "If the defendant makes such a showing, the burden shifts to the plaintiff to raise a triable issue of fact as to those elements on which the defendant met its prima facie burden of proof" (Delia v Wieder, 236 AD3d 857, 858 [2d Dept 2025]). "Generally, summary judgment is not appropriate in a medical malpractice action where the parties adduce conflicting medical expert opinions" (Garcia v Hollander, 241 AD3d 651, 653 [2d Dept 2025] [internal quotation marks and citations omitted].) However, "expert opinions that are conclusory, speculative, or unsupported by the record are insufficient to raise triable issues of fact" (Barnaman v Bishop Hucles Episcopal Nursing Home, 213 AD3d 896, 898-899 [2d Dept 2023]).
In support of their motion, the movants submit an expert affirmation from John K. Houten, M.D. ("Dr. Houten"), a licensed physician board certified in neurological surgery.
Dr. Houten opines that the treatment of all NYCHHC/Kings County Hospital Center physicians and staff complied with the standard of care. After the February 1, 2022 laminectomy (which Plaintiff concedes complied with the standard of care), the movant's expert states that "Dr. Feinberg did not personally see, treat, evaluate, or examine the plaintiff" during the post-operative period until February 8, and that her care was managed by attending physicians Dr. Saint Clair on February 6 and Dr. Sadr on February 7. The expert opines that it was not a departure from the standard of care for Dr. Feinberg to rely on the attending neurosurgeons.
On examination on February 7 at 6:22 a.m., the movant's expert notes that Plaintiff "was found to be weaker and had difficulty moving her legs," she had "significantly decreased motor skills in her lower extremities," and an "increase in her bilateral upper and lower extremity weakness." The expert opines that a cervical and lumbar spine MRI were timely ordered and performed "within a few hours after her clinical [*4]neurological deficits and complaints were discovered."
Dr. Houten opines that although the MRI results were interpreted by a radiologist to show "extensive posterior epidural hemorrhage throughout, with cord compression secondary to the hematoma," he agrees with the interpretation of Dr. Sadr that "the films do not reveal a mass effect or cord compression being asserted on the plaintiff's spinal cord." Instead, the expert opines that Dr. Sadr correctly assessed that "the appearance of the cord seen on the films was the result of damage to the cord pre-laminectomy, and the blood and fluid filled the space behind the spinal cord where there had previously been bone, muscle, and ligaments. It was not actually producing additional spinal cord compression." For this reason, the expert opines that Dr. Sadr's decision not to operate on Plaintiff on February 7 was within the standard of care, and there was "no need for emergency surgery on that day."
The expert further opines that Dr. Feinberg, with assistance from Dr. Saint Clair, acted within the standard of care on February 8 when they returned the patient to the operating room for "exploratory surgery and a further laminectomy." Although the movant's expert agrees with Dr. Sadr that "there was no reason to treat the [MRI] finding as an emergent condition," they opine that it was also appropriate for Dr. Feinberg to "take the plaintiff back to the operating room, even if only to ascertain, evaluate, and confirm that there was no hematoma compressing the spinal cord" the following day. The expert opines that Dr. Feinberg exercised diligence by opening the dura and looking for signs of hematoma, but her procedure "definitely confirmed a hematoma was not present." The expert opines that "there was no indication for further intervention at that time, such as the placement of hardware."
The movant's expert opines that no further surgery was indicated based on the February 9 MRI, because Dr. Feinberg and Dr. Saint Clair had already confirmed "there was no hematoma placing a mass effect or compression on the plaintiff's spinal cord," and further surgery would have been "pointless" and exposed the patient to surgical risks with no benefit.
On the issue of proximate causation, the expert opines that Dr. Sadr's reading of the February 7 MRI was validated by "the absence of a hematoma . . confirmed by the exploratory surgery on February 8." Thus, the expert opines that no alleged delay in performing emergency surgery proximately caused the patient's injuries. Instead, the expert opines that the neurological deterioration sustained by the patient was "inevitable" and a result of her underlying spinal condition. Although Dr. Feinberg and Dr. Saint Clair attempted to "correct the condition, or at least arrest continued deterioration, via a laminectomy," this ultimately "failed" despite the procedure and all post-operative care being performed within the standard of neurosurgical care.
On the claims regarding the neurosurgical P.A.s, the movant's expert opines that they were acting at all times under the direction and supervision of the attending physicians. Specifically, the expert opines that P.A. Barley's February 7 examination and assessment of the patient was within the standard of care, and she discussed the patient's symptoms and cervical MRI results with Dr. Sadr, based on the record and the attending physician's testimony. It is not disputed that Dr. Sadr reviewed the MRI results on February 7.
Based on evaluation of the movant's submissions, the Court finds the movant has established prima facie entitlement to summary judgment on behalf of Dr. Feinberg, Dr. Saint Clair, and Dr. Sadr, setting forth that they complied with the standard of care post-operatively, that "stat" or emergent surgery was not indicated by the patient's MRI results, and that their alleged acts and omissions were not a proximate cause of the patient's injuries because, in the expert's opinion, she did not have a hematoma causing cord compression. The expert also establishes prima facie that the staff neurosurgical P.A.s, including P.A. Barley, did not exercise independent medical judgment and were appropriately following the orders and directives of the attending physicians. The burden therefore shifts to Plaintiff to raise a triable issue of fact.
In opposition, Plaintiff submits an expert affirmation from a licensed physician [name of expert redacted], board certified in neurological surgery. The Court was presented with a signed, unredacted copy of the affirmation for in camera inspection.
Plaintiff's neurosurgical expert opines that NYCHHC, through its physicians including Dr. Feinberg, Dr. Saint Clair, and Dr. Sadr, departed from the standard of care in timely diagnosing and treating Plaintiff for sudden neurological changes and accumulation of epidural fluid.
First, Plaintiff's expert opines that the defendants failed to timely order a cervical MRI until 9:05 a.m. on February 7. Plaintiff counters the movant's expert opinions that the MRIs were properly ordered "within hours" of her new onset complaints the morning of February 7. Plaintiff states that her symptoms first appeared by the evening of February 6 and were discussed by P.A. Augustin and Dr. Feinberg over text message at approximately 9:57 p.m. Based on these messages, Plaintiff's expert opines that she began experiencing significant symptoms of weakness and decreased mobility in her extremities the night of February 6, with P.A. Augustin acknowledging that she had been "close to full strength" in lower extremities before that point. Those symptoms were later documented in her chart by P.A. Sionov on February 7 at 6:22 a.m.
Plaintiff's expert opines that the substantial decrease in movement "required immediate action under the standard of care, including an examination by an attending neurosurgeon as soon as it practically could be performed, and the ordering of immediate or 'stat' MRI of the spine (including cervical)". When Dr. Feinberg was notified of this change, the expert opines that she departed from the standard of care by simply authorizing P.A. Augustin to prescribe Valium and a lumbar spine MRI, rather than directing an immediate evaluation "by either herself or the on-call neurosurgeon, Dr. Saint Clair." The expert further opines that Dr. Feinberg departed from the standard of care when she directed the P.A. to add a cervical spine MRI several hours later (at approximately 8:59 a.m. on February 7) and did not specify that it should be ordered on a "stat" rather than routine basis. The expert states that although Dr. Feinberg was not the on-call attending, she was "specifically notified by text about the patient's sudden and substantial neurological deterioration" and "gave the PAs several orders and instructions in how to care for the patient." Therefore, the expert opines Dr. Feinberg's alleged failure to recommend an urgent evaluation and cervical MRI constituted a departure from the standard of care.
Plaintiff's expert also places responsibility on Dr. Saint Clair, the attending neurosurgeon who was present at the hospital during the overnight shift on February 6-7, for not making rounds and examining the patient in accordance with the standard of care.
Additionally, Plaintiff's expert opines that the physician's assistants and staff at Kings County Hospital Center — specifically P.A. Augustin, who was on shift at that time and communicated with Dr. Feinberg over text — did not appropriately document or communicate the patient's symptoms to Dr. Saint Clair, the on-duty neurosurgeon. Plaintiff's expert opines that this lack of communication between the staff and attending physicians led to a delay in ordering the cervical spine MRI and further treatment.
The expert also opines that the MRI also should have been ordered on a "stat" rather than routine basis. The expert states that her examination at 6:22 a.m. on February 7 confirmed a "significant decrease" in bilateral deltoid strength from 4/5 to 2/5 (left) and 5/5 to 3/5 (right). The cervical spine MRI was performed three hours after that examination, and the results were not reported until 3:30 p.m., which the expert opines constituted a departure from the standard of care by the attending physicians and staff.
Next, Plaintiff's expert opines that the cervical MRI was improperly interpreted and "disregarded" by attending physician Dr. Sadr on February 7. The expert notes that according to a note from P.A. Barley at 3:56 p.m., the cervical MRI showed "an acute epidural hematoma (likely less than a week old) starting at C3 and extending to T2 levels," and they had discussed a plan with the patient to "possibly return to the OR for evacuation of epidural hematoma (which may offer the best chance of recovery/improvement in lower extremity weakness)." Dr. Sadr testified that he discussed the case with P.A. Barley, but that based on his interpretation of the MRI images, "the spinal cord had in essence collapsed," and the fluid "was not compressive at all" but simply filling an empty space due to her preexisting spinal abnormalities.
Plaintiff's expert disagrees with the opinion of Dr. Sadr and the movant's expert that there was no need for emergency surgery based on the cervical spine MRI. Plaintiff's expert opines that the MRI "clearly showed compression of the spinal cord by epidural fluid," and the standard of care required Dr. Sadr to take the patient "emergently" to the operating room for "evacuation of the epidural fluid and decompression of the spinal cord." The expert also opines that if Dr. Sadr disagreed with the radiologist's findings of spinal cord compression, as he testified, he deviated from the standard of care by not discussing that disagreement with [*5]the radiologist who interpreted the images.
The expert opines that Dr. Feinberg also departed from the standard of care by delaying the second operation until February 8 at 3:26 p.m. In the expert's opinion, the MRI showing "large epidural hematoma causing significant compression," combined with her worsening lower extremity strength, required "emergently" taking the patient to the operating room. Again, the expert relies on text messages that indicate Dr. Feinberg made the decision to operate as early as 9:15 a.m., and the patient consented to surgery shortly thereafter. The expert opines that the additional 6-hour delay between the patient consenting to surgery and the procedure at 3:26 p.m. constituted a departure from the standard of care.
Finally, the expert opines that a further operation should have been ordered after the February 9 MRI showed "a large fluid collection within the entire laminectomy defect that was causing persistent severe spinal cord compression along the entire length of fluid collection." The expert opines that the re-accumulation of fluid is "not a rare occurrence" following decompression surgery, and the standard of care required further surgical intervention to "re-evacuate the chronic hematoma or seroma" and place a temporary epidural drain "to prevent further re-accumulation of the epidural fluid."
The expert opines that further surgery should have been ordered and performed by Dr. Feinberg, Dr. Saint Clair, and/or Dr. Sadr, as all three physicians evaluated Plaintiff between February 9-11, and Dr. Sadr and Dr. Feinberg also saw the patient for follow-up care on February 14 and February 24. Therefore, the expert opines that each of them departed from the standard of care on those dates by "failing to take the patient back to the operating room to again drain the epidural fluid, relieve the spinal cord re-compression, and consider placing a temporary epidural drain."
On the issue of proximate causation, Plaintiff's expert opines that the aforementioned departures all proximately caused and contributed to a 41-hour delay between the onset of Plaintiff's symptoms on February 6 at 9:57 p.m. and the surgical intervention on February 8 at 3:26 p.m. The expert further opines that this delay led to a worsened outcome for Plaintiff.
The expert counters the opinion of the movant's expert that the patient's injuries were not caused by hematoma. The expert explains their counter-opinion in detail, stating that it is not relevant whether the fluid was "hematoma, seroma, and/or other fluids, or a combination thereof," but that it was crucially causing "spinal cord compression and accompanying new neurological deficits." The expert opines that the fact Dr. Feinberg did not find a hematoma during the February 8 surgery does not negate the MRI findings or need for evacuation, as it is more likely that seroma was the source of the spinal cord compression, and it may not be visible during surgery. The expert opines that it is immaterial that Dr. Feinberg did not "see" fluid causing spinal cord compression during the February 8 operation, because "any spinal cord compression could only be diagnosed by MRI." Thus, Plaintiff's expert disagrees with the movant's expert that the February 8 procedure "confirmed" that there was "no mass effect or compression being placed on the plaintiff's spinal cord by a hematoma." Plaintiff's expert opines that the pre- and post-operative MRI reports were "more reliable and definitive than what the surgeon sees during the operation," and more accurately reflected the presence of "epidural fluid collection that is compressing the spinal cord."
Plaintiff's expert also counters the movant's opinion that Plaintiff's injuries were "inevitable" and could not have been prevented with earlier or additional surgery. The expert opines that the movant's departures caused worsened and permanent damage to Plaintiff's spinal cord and neurological functioning, leaving her with quadriplegia and depriving her of a substantial chance to return to her baseline function. In the opinion of Plaintiff's expert, her chances of recovering function would have been improved if MRI imaging and surgery had been ordered and performed emergently when her symptoms first appeared, and she still could have benefited from emergent surgery prior to the afternoon of February 8, based on the later MRI showing the hematoma or seroma was "partially evacuated" but still present. The expert also opines that the choice to not attempt further drainage of the fluid was a proximate cause of her injuries.
Plaintiff also submits an expert affirmation from a licensed physician [name of expert redacted], board certified in radiology and neuroradiology. The Court was presented with a signed, unredacted copy of the affirmation for in camera inspection.
In reply, Defendants argue that the radiology expert has not laid a proper foundation to reliably opine on the standard of care from a neurosurgical perspective. As Plaintiff has submitted a separate affirmation from a neurosurgeon on these issues, the Court will not consider the opinions of the radiologist as to the standard of care. However, the Court will consider Plaintiff's radiology expert with respect to their interpretation of the MRI images.
Plaintiff's neuroradiological expert opines, based on their own review of all the patient's MRI images from May 13, 2021 through February 27, 2022, that these scans were "correctly read and reported by the radiologists who issued written reports for the studies." The expert concurs with the reports that the images were consistent with epidural hematoma or other fluid compressing the spinal cord. Specifically, they opine that the February 7, 2022 MRI "clearly showed severe spinal canal stenosis and associated spinal cord compression being caused by fluids in the epidural space." The expert further opines that these images were "completely consistent with the patient's sudden, significant, and substantial neurological changes."
The expert offers their own analysis of the February 7 images, opining that the cervical MRI showed 5-10 mm of liquid "compressing the spinal cord at several levels (more than half the canal is filled with such) within the cervical spine, including in the posterior arch of the C1 vertebrae, and moving down into C2, C3, C4, C5, C6, C7, and going into the upper thoracic spine to T2." The expert opines that this demonstrates a "substantial change" from the MRIs taken in 2021 prior to the patient's laminectomy. The expert notes that there was "improvement in the syrinx" compared to the older MRIs, but "new and substantial compression of the spinal cord . . . caused by the fluid in the epidural space." The expert therefore disagrees with the interpretation of Dr. Sadr and the movant's expert that the MRI did not show compression. The expert opines that "if the fluid was just 'filling the epidural space'" as interpreted by Dr. Sadr, the presence of cerebrospinal fluid (CSF) would have looked vastly different from the appearance of no CSF on the February 7 MRI.
The neuroradiological expert opines that the February 9, 2022 MRI again showed a "large fluid collection within entire laminectomy defect," and it was causing "persistent severe spinal cord compression." The expert opines that the MRI revealed fluid was "partially evacuated" in the areas where Dr. Feinberg performed the second surgery, but it "remained below where Dr. Feinberg stopped her laminectomy and went into the upper thoracic space, which Dr. Feinberg did not explore in the second surgery." The expert therefore disagrees with the movant's position that epidural fluid (whether hematoma, seroma, or a mixture of both) did not cause or contribute to her sustaining cord compression and deterioration in strength and motor function.
Based on evaluation of these submissions, the Court finds Plaintiff has raised clear issues of fact as to the alleged departures from the standard of care by Dr. Feinberg, Dr. Saint Clair, and Dr. Sadr. These include the issues of fact regarding Dr. Feinberg's alleged involvement in the patient's care on February 6-7, and the recommendations or orders she allegedly communicated to the P.A.'s, as well as her alleged failure to perform surgery on an immediate/emergency basis on February 8. As to Dr. Saint Clair, there are issues of fact as to whether he adequately followed and assessed the patient's condition as the on-call attending neurosurgeon during the night shift on February 6-7.
The experts also offer detailed, conflicting opinions as to the MRI images and whether they indicate epidural fluid requiring emergent surgery, or a preexisting complication to the spinal cord which could not have been corrected by earlier or further surgery. As such, they raise issues of fact as to Dr. Sadr's interpretation of the February 7 images, whether he departed from the standard of care in not performing surgery on that date, and whether additional neurosurgery and placement of an epidural drain was required after February 8.
Due to their differing opinions on the MRI images and the presence of epidural hematoma/seroma, the parties' experts also present issues of fact as to whether the alleged delays and departures from the standard of care proximately caused Plaintiff's neurological deterioration and quadriplegia.
As these issues of fact require resolution of a jury, the motion for summary judgment must be denied as to the medical malpractice claims against Dr. Feinberg, Dr. Saint Clair, and Dr. Sadr.
With respect to co-defendant P.A. Barley, physicians' assistants acting under the direction and [*6]supervision of an attending physician are generally not liable for malpractice, unless they exercised independent medical judgment or committed specific, independent acts which proximately caused harm to the patient, e.g., failing to properly examine the patient or report their symptoms (see Nasima v Dolen, 149 AD3d 759, 760 [2d Dept 2017]).
Here, Plaintiff's neurosurgical expert did not raise a genuine issue of fact as to any departure from the standard of care by P.A. Barley individually. Plaintiff's expert concedes that "after the MRI results were conveyed to Dr. Sadr [on February 7], there were no departures from the standard of care by P.A. Barley and the other neurosurgical PAs."
The only direct mention of P.A. Barley from Plaintiff's expert involves the 3:56 p.m. progress note on February 7, in which she discussed the cervical MRI findings, as well as the plan to possibly return to the operating room for evacuation of epidural hematoma. It is undisputed that this occurred after the attending physician Dr. Sadr reviewed the MRI report, and Dr. Sadr testified this assessment was discussed with him. Plaintiff's expert also has not raised a genuine, triable issue of fact that there was any delay attributable to P.A. Barley in discussing the case with Dr. Sadr, or that she failed to report pertinent information to him. Thus, Plaintiff's claims of P.A. Barley's independent negligence are not supported by the record and their opinions on P.A. Barley are conclusory, speculative, and contradicted by the record. For this reason, the part of the motion seeking summary judgment on behalf of P.A. Barley is granted. Plaintiff's claims against her are dismissed, as well as vicarious liability claims against NYCHHC on P.A. Barley's behalf.
Notwithstanding, Plaintiff has sufficiently raised issues of fact as to the alleged independent negligence of P.A. Augustin, another NYCHHC-employed physician's assistant [FN3]
. Plaintiff argues that her symptoms first manifested as early as 9:57 p.m. on February 6, when P.A. Augustin discussed her condition over text message with Dr. Feinberg. However, Dr. Feinberg testified she was away from the hospital, and the attending neurosurgeon was Dr. Saint Clair. Plaintiff's expert opines that P.A. Augustin failed to appropriately relay information and alert the supervising physician Dr. Saint Clair about Plaintiff's sudden deterioration on February 6, which contributed to the delay in Plaintiff's physical examination and imaging studies the following morning. The discrepancies in the testimony and medical chart as to when Plaintiff's complaints were first known, documented, and communicated to the on-call attending neurosurgeons raise issues of fact and credibility which must be resolved by a jury. Therefore, summary judgment cannot be granted as a matter of law on those claims against NYCHHC for the alleged acts and omissions of nonparty P.A. Augustin.
Accordingly, it is hereby:
ORDERED that the part of the motion (Seq. No. 1) seeking summary judgment on behalf of Dr. Smith is granted without opposition, Plaintiff's claims against him are dismissed, and the vicarious liability claims against NYCHHC on his behalf are dismissed; and it is further
ORDERED that the part of the motion (Seq. No. 1) seeking summary judgment on behalf of P.A. Barley is granted, Plaintiff's claims against her are dismissed, and the vicarious liability claims against NYCHHC on her behalf are dismissed; and it is further
ORDERED that the part of the motion (Seq. No. 1) seeking summary judgment on behalf of Dr. Feinberg, Dr. Saint Clair, Dr. Sadr, and NYCHHC is granted to the extent of dismissing any claims of medical malpractice prior to February 6, 2022, dismissing the claim of lack of informed consent, and dismissing the claim of negligent hiring; and it is further
ORDERED that the motion (Seq. No. 1) seeking summary judgment on behalf of Dr. Feinberg, Dr. Saint Clair, Dr. Sadr, and NYCHHC is otherwise denied; and it is further
ORDERED that as Dr. Smith and P.A. Barley have been granted summary judgment herein, and this action was previously discontinued against Dr. Kuzmin by the stipulation dated November 3, 2025, they shall [*7]be removed from the caption; and it is further
ORDERED that the caption is amended to read:
MERLET HAUGHTON,
Plaintiff,
against
MICHELLE LAUREN FEINBERG, M.D., ERIC SAINT CLAIR, M.D., ALI D. SADR, M.D., NEW YORK CITY HEALTH AND HOSPITALS CORPORATION and KINGS COUNTY HOSPITAL CENTER,
Defendants.
The Clerk shall enter judgment in favor of SKEETER BARLEY, P.A. and ARIEN JAVON SMITH, M.D.
This constitutes the decision and order of this Court.
ENTER.Hon. Consuelo Mallafre MelendezJ.S.C.

Footnotes

Footnote 1:Additionally, Defendant Dmitry Nikolaevich Kuzmin, D.O. was previously discontinued from the action by stipulation signed by counsel for all parties on November 3, 2025, and there are no remaining vicarious liability claims against NYCHHC on his behalf.

Footnote 2:The movants' experts did not address Dr. Feinberg's text messages, which were submitted by Plaintiff in opposition and exchanged by the movants during discovery. The movants do not object or dispute these messages in their reply.

Footnote 3:P.A. Augustin is the only nonparty physician's assistant identified in the parties' submissions who treated or observed Plaintiff during the February 6 night shift.